JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant Gary Ford (Ford) appeals the judgment of conviction and sentence entered following a bench trial in the Cuyahoga County Common Pleas Court. Ford was found guilty of tampering with evidence, in violation of R.C. 2921.12, a felony of the third degree. Finding no merit to this appeal, we affirm.
 {¶ 2} On April 8, 2005, Ford was indicted on one count of tampering with evidence. On July 1, 2005, the jury returned a guilty verdict, and Ford was sentenced to five years of incarceration, a fine of $250, and three years of postrelease control with mandatory drug testing and counseling. This conviction was reversed by this court on July 20, 2006.State v. Ford, Cuyahoga App. No. 86951, 2006-Ohio-3723.
 {¶ 3} On April 12, 2007, the trial court accepted Ford's written waiver of jury trial and commenced a bench trial. At the conclusion of the State's case, Ford moved for acquittal pursuant to Crim. R. 29, which was denied by the trial court. The following day, April 13, 2007, two witnesses were called on behalf of Ford. On the same day, the trial court found him guilty of tampering with evidence, in violation of R.C. 2921.12, as charged in the indictment. The court again imposed a sentence of five years of incarceration and a three-year term of postrelease control, including drug counseling and testing. *Page 4 
 {¶ 4} Ford filed a timely appeal and now seeks to have his conviction reversed or, alternatively, have his sentence vacated and remanded for resentencing.
 {¶ 5} The following evidence was adduced at trial.
 {¶ 6} On the evening of February 11, 2005, the Cleveland vice unit was conducting an undercover drug operation in the general area of East 123rd Street, between Ohlman and Fairport Avenues, in Cleveland. Detectives Robert Glover (Glover) and Kevin Freeman (Freeman) were in an unmarked, undercover vehicle, observing several men at the bus stop at East 123rd and Ohlman. Glover and Freeman parked a short distance from the bus stop and radioed Detectives James Cudo (Cudo), Martina Latessa (Latessa) and James Purcell (Purcell), who were conducting a buy-bust operation in the area of East 123rd. Glover and Freeman requested that Cudo, Latessa, and Purcell check out the men at the bus stop to see if they were selling drugs.
 {¶ 7} Cudo, Latessa, and Purcell drove up, checked out the men by running warrant checks on them, and left the scene. The group of men, between six and eight in number, walked across the street and entered 932 East 123rd, located at the corner of East 123rd and Fairport Avenue.
 {¶ 8} Glover and Freeman parked their vehicle on Fairport Avenue, about three houses down from the corner, in order to monitor the men, as the house was a known drug house. As a precaution, Cudo, Latessa, and Purcell, in their unmarked *Page 5 
car, positioned themselves north of the house, while Detectives Creighton and McClelland, in another unmarked car, positioned themselves south of the house.
 {¶ 9} Between six and eight men came back out of the house and stood by the front gate of the house. Glover and Freeman watched as a car pulled up and some of the men entered the car and participated in what the detectives believed to be a drug transaction. Glover called yet another officer, Detective Eugene Jones (Jones), who was posing as a drug user, and told him to try to get a drug buy from the men. Jones, in plain clothes, was alone in an unmarked car with buy money, a police radio, and a cell phone.
 {¶ 10} As Jones started to pull up toward the house, some of the men started walking southbound on East 123rd Street. Ford and Thomas Hunter (Hunter), remained standing on the porch. When Jones stopped, he said something to Ford and Hunter. He then called Glover and Freeman on his cell phone.
 {¶ 11} Glover and Freeman, by use of the speaker phone feature on their cell phone, could hear Jones ask one of the men, later identified as Hunter, for a twenty, meaning a twenty dollar piece of crack cocaine. Hunter replied that he would get him something, and he went inside the house. Hunter came back out with something in his hand. Glover realized that the object in Hunter's hand was a weapon when he heard Jones ask Hunter if he was going to shoot him. Hunter replied affirmatively. Freeman testified that he observed Hunter point a shotgun at Jones. Jones testified that Hunter pointed a sawed-off shotgun at him and *Page 6 
threatened to shoot and kill him. Freeman immediately drove up to the 932 East 123rd Street address to aid Jones.
 {¶ 12} Glover and Freeman observed Hunter come out of the front gate of the house and onto the sidewalk. Hunter was about to cross the street toward Jones' car when Ford ran off the porch and retrieved the shotgun from Hunter.
 {¶ 13} Jones had started to slowly drive his car northbound on East 123rd Street. Hunter chased after him on foot. Freeman stopped his car almost directly in front of 932 East 123rd Street. Glover bolted out of the passenger's seat, with gun in hand, running after Hunter.
 {¶ 14} While Glover was running after Hunter, Ford was standing on the porch holding the sawed-off shotgun. Glover testified to the following:
 "[T]he male [later identified as Hunter]came out of the gate onto the sidewalk, and he was about to cross the street towards Jones' car when the other male [later identified as Ford] in [sic] the porch ran up behind him and as we was — we had just got to the corner, and the male, I could see it was a shotgun. He took the shotgun from that male and he ran back on the porch with it, but the male he took the gun from proceeded and Detective Jones started to move his car towards 123rd and Durant and the male who was in the street took off after Jones. And I couldn't see what he had in *Page 7 his hand. I didn't know if he had a revolver or whatever, but he took off after Jones, and Jones was still driving but he was looking back at the guy." (Tr. 43.)
Glover broadcasted on a police channel that a man was chasing after Jones with what appeared to be a weapon in his hand at 932 East 123rd Street. Freeman observed Ford walk back into the house.
 {¶ 15} Upon hearing the broadcast, Cudo, Purcell, and Latessa arrived at the scene about the same time in a vehicle with activated lights and sirens and assisted Glover in arresting Hunter. Hunter did not have a weapon on him. Hunter was secured and placed in the rear of an unmarked car. Hunter then signed a form giving consent to search the house.
 {¶ 16} Glover ordered Purcell and Cudo back to 932 East 123rd Street. He told them that Hunter had handed the gun off to Ford and that Ford had just run into the house. Detectives McClelland and Creighton, who had arrived in their vehicle with activated lights and sirens, took positions with Freeman on each side of the house to ensure no one could exit the house.
 {¶ 17} Cudo testified that, upon arrival, he had radioed for additional police officers, as there was at least one man in the house with a shotgun, and at that time only McClelland, Creighton, and Freeman were on the perimeter of the house at 932 East 123rd. Cudo testified that he could hear the backup police cars, which arrived *Page 8 
within thirty seconds. Two marked cars quickly came to the scene with lights and sirens activated.
 {¶ 18} Cudo and Purcell knocked on the front door and, with weapons drawn for their protection, announced their presence. A female opened the door. Ford then came to the door and was immediately grabbed from the doorway and taken to the side of the porch by Purcell. Once more officers arrived at the house, the detectives made entry into the premises to check for individuals inside the house. When Latessa arrived at the house, she was informed that the department was looking for a sawed-off shotgun. Within minutes she found the sawed-off shotgun, unobscured, on a high shelf in a closed hallway closet, within feet of the entrance.
 {¶ 19} At trial, Ford called Hunter to testify. Hunter gave conflicting versions of the events of that evening. He initially testified that the weapon never left his house or its location in the front, downstairs closet. However, he later acknowledged that Ford did take the shotgun from him and placed it back into the closet, because Ford knew that "those guys" were the police. Hunter and Glover both testified that the sawed-off shotgun was inoperable.
 {¶ 20} Hunter also admitted that Ford contacted him by letters, while Ford's case was pending, to suggest a different version of events regarding the night of the offense. Ford stated in the letters that he could bring a lawsuit against the State of Ohio for wrongful imprisonment stemming from the instant case. The letters were admitted into evidence at the close of Ford's case. *Page 9 
 {¶ 21} Ford raises the following four assignments of error. The first two will be addressed together as they are closely related in facts and law. The second two assignments will also be addressed jointly for the same reason.
ASSIGNMENT OF ERROR ONE "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR ACQUITTAL AS TO THE CHARGE WHEN THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION."
ASSIGNMENT OF ERROR TWO "APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 22} In his first assignment of error, Ford argues that the trial court erred in denying his motion for acquittal because his conviction was not supported by sufficient evidence. In his second assignment of error, Ford contends that his conviction was against the manifest weight of the evidence. As these arguments involve different standards of review but involve a review of the same evidence, we discuss them together.
 {¶ 23} The standard of review for sufficiency of evidence is set forth in the seminal case of State v. Bridgeman (1978), 55 Ohio St.2d 261.
 "Pursuant to Criminal Rule 29 (A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." Id. at syllabus. *Page 10 
 {¶ 24} We noted in State v. Bradley, Cuyahoga App. No. 87024,2006-Ohio-4589, that "Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks (1991), 61 Ohio St.3d 259
* * *." The Supreme Court held:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Bradley at%12. (Citation omitted.)
 {¶ 25} According to State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52, the standard in reviewing a weight of the evidence challenge is a distinct legal concept both quantitatively and qualitatively different from the sufficiency standard.Thompkins further describes this standard as follows:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis in original.)
 * * * `The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. at 387. (Internal citations omitted.) *Page 11 
 {¶ 26} The essential elements of tampering with records charged against Ford are set forth in R.C. 2921.12, which provides:
 "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."
 {¶ 27} In the case sub judice, the State's evidence demonstrated that Ford knowingly removed a thing, to wit: a sawed-off shotgun, with purpose to impair its availability as evidence, knowing that an official investigation was in progress, or was about to be or likely to be instituted. Defense witness Hunter acknowledged that Ford took the shotgun from him and put it back in the closet because Ford knew that" those guys" were the police.
 {¶ 28} Moreover, the evidence demonstrated that within seconds of seeing Hunter threatening Jones with a shotgun, Glover was broadcasting on a police channel that a man was chasing after Jones with what appeared to be weapon in his hand at 932 East 123rd
Street. Glover testified he was broadcasting this information as he was running after Hunter down East 123rd Street, and while viewing Ford standing on the front porch of 932 East 123rd. Within minutes, there were marked and unmarked police cars at that location, all of which traveled there with lights and sirens activated. *Page 12 
 {¶ 29} The trial court could reasonably conclude that given the quick police response time in surrounding 932 East 123rd
Street, and the sounds and sights of oncoming police vehicles, Ford certainly knew that, even if an investigation was not currently in progress, an investigation was about to take place.
 {¶ 30} Further, there was additional evidence that Ford knew that the shotgun was evidence. Ford knew a crime had been committed in front of him. He was present when Hunter pointed and threatened to kill another person with a sawed-off shotgun, yet he took the weapon out of Hunter's hands and into his own. Also, he was able to see from his vantage point on the front porch, a man running after Hunter while broadcasting from a police radio. Damaging evidence supported the trial court's conclusions that Ford knew there was an investigation in progress and that the weapon he was carrying away from the scene of the crime was in fact evidence. It was Hunter's testimony that Ford took the weapon away from him in the front yard of 932 East 123rd Street because he knew "those guys" were the police.
 {¶ 31} After review of the evidence and application of the distinct standards of review, we find that Ford's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. Construing the evidence in a light most favorable to the State, there was sufficient evidence presented for a rational trier of fact to conclude that the essential elements of tampering with evidence was proven beyond a reasonable doubt. *Page 13 
 {¶ 32} We further conclude that the trier of fact did not lose its way in convicting Ford of tampering with evidence, and that his conviction was not against the manifest weight of the evidence.
 {¶ 33} Accordingly, Ford's first and second assignments of error are without merit and are overruled.
 {¶ 34} Ford's third and fourth assignments of error, which as previously stated will be addressed together, state as follows:
ASSIGNMENT OF ERROR THREE "THE TRIAL COURT ERRED BY ORDERING APPELLANT TO SERVE MORE THAN THE MINIMUM SENTENCE."
ASSIGNMENT OF ERROR FOUR "THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT TO A MAXIMUM SENTENCE."
 {¶ 35} Ford argues in his last two assignments of error that the trial court erred when it sentenced him to a five-year prison term. The sentence was a nonminimum, maximum sentence for a felony of the third degree, which Ford argues violates his due process rights by the ex post facto application of State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856.
 {¶ 36} As succinctly stated by this court in State v. Hibbitt, Cuyahoga App. Nos. 89497 and 89885, 2008-Ohio-680:
 "We find the imposition of nonminimum and consecutive sentences imposed on appellant does not constitute error. After Foster, trial courts are `no longer required to make findings or *Page 14 give their reasons for imposing maximum, consecutive, or more than the minimum sentences.' Foster, supra, at p. 100. We have previously rejected the argument that Foster does not apply to defendants who committed their crimes pre-Foster but were sentenced post-Foster, and also dismissed the claim that a defendant's due process rights were violated with an ex post facto application of Foster. See State v. Mallette, Cuyahoga App. No. 87894, 2007 Ohio 715, discretionary appeal not allowed, 115 Ohio St. 3d 1439, 2007 Ohio 5567, 875 N.E.2d 101.
 This court has found that Foster does not violate ex post facto. Specifically, in State v. Mallette * * *." Hibbitt at ¶ 10.
 {¶ 37} Given our holding in Mallette, we find Ford's third and fourth assignments of error are without merit and are overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 SEAN C. GALLAGHER, P.J., and ANN DYKE, J., CONCUR *Page 1